# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

———————————

Nº 03 Civ. 5497 (RJS)

———————————

CYNTHIA M. KELLNER,

Plaintiff,

VERSUS

FIRST UNUM LIFE INSURANCE COMPANY,

Defendant.

———————————

OPINION AND ORDER
November 26, 2008

———————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff Cynthia M. Kellner brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging that she was wrongfully denied disability benefits by Defendant First Unum Life Insurance Company ("First Unum") under the terms of a long-term disability plan funded by her former employer, Nixon Peabody LLP ("Nixon" or "the firm"). First Unum counterclaims to recover benefits it alleges Kellner wrongfully received, as well as attorneys' fees and costs related to this action.

Before the Court is First Unum's motion for summary judgment. For the reasons set forth below, Defendant's motion is granted as to Kellner's claim, denied with respect to the counterclaim, and denied without prejudice as to attorneys' fees and costs.

## I. BACKGROUND

The Court has taken the facts described below, where possible, from the parties' respective Local Rule 56.1 statements. Where only one party's Rule 56.1 statement is cited, the opposing party does not dispute that fact or has offered no admissible evidence to controvert that fact. Additionally, the Court cites directly to the claim file maintained by First Unum in connection with Kellner's disability claim and, as discussed below, the additional materials submitted by the parties in connection with this motion.

### A. Facts

Kellner began working at Nixon in 1982 and became an equity partner in 1992. (First Unum Claim File ("FULCL") at 228, 230.) As a benefit of her employment at Nixon, Kellner was covered under the terms of the firm's long-term disability plan (the "LTD Plan" or "the Plan"). (Pl.'s 56.1 ¶ 8.) The LTD Plan was funded by Nixon and administered pursuant to an insurance policy issued by First Unum. (FULCL at 212.) Kellner worked her last day at Nixon on January 20, 2001. (*Id.* at 304.) On March 28, 2001, she executed a resignation and release with the firm relating to "issues regarding the over-reimbursement of expenses." (*Id.* at 59-62.)

As discussed below in greater detail, Kellner submitted a claim for benefits under the LTD Plan on April 13, 2001, without disclosing the circumstances surrounding her resignation. (*Id.* at 455-59.) On June 8, 2001, Defendant initially approved her request for long-term disability benefits. (*Id.* at 501-02.) However, in July 2002 — after learning that Kellner had resigned from Nixon, been disbarred, and was the subject of

a criminal investigation — First Unum informed Kellner that she did not qualify for disability benefits and that its prior payments "were based upon insufficient information." (*Id.* at 565-67.) First Unum twice denied Kellner's appeal of this determination (*id.* at 615-18, 628-29), and this litigation followed.

### 1. Nixon's Long-Term Disability Plan

The LTD Plan was issued by First Unum to Nixon under policy number 452106-001, effective April 1, 1989 and as amended through May 15, 2000. (*Id.* at 165, 212.) The terms of Nixon's LTD Plan are set forth in a document describing the plan (*id.* at 162-212) and summarized in the Summary Plan Description ("SPD") (*id.* at 138-63).

#### a. The SPD

The SPD in effect at the time of Kellner's disability claim provides a "plain English" summary of the LTD Plan. (*Id.* at 162.) It makes clear that "[t]he cost of this plan is paid entirely by" Nixon, but denotes the "Type of Administration" as "Insurer Administration." (*Id.* at 142.) Under the heading "Discretionary Authority," the SPD states that "[i]n making any benefits determination under the policy, [First Unum] shall have the discretionary authority both to determine your eligibility for benefits and to construe the terms of the policy." (*Id.* at 158.)

The body of the SPD summarizes the basic terms of the LTD Plan, including the Plan's process for calculating benefits, the procedure for making claims determinations, and beneficiaries' rights under ERISA. It states that, under the LTD Plan, "'[d]isability' and 'disabled' mean that because of injury or sickness . . . you cannot perform each of the material duties of your

2

regular occupation . . . ." (*Id.* at 154.) The SPD also makes clear that a covered employee must provide written notice of any claim for benefits "within 30 days of the date [the] disability starts," including proof of "the cause of the disability." (*Id.* at 144.) It notes that coverage under the LTD Plan ends upon "the date employment terminates," which includes the "[c]essation of active employment." (*Id.* at 145.)

Under a heading labeled "What happens if facts are misstated?," the SPD states that "[i]f relevant facts about you were not accurate," "a fair adjustment of premium will be made," and "the true facts will decide if and in what amount insurance is valid." (*Id.* at 143.)

### b. The LTD Plan

The LTD Plan contains the same definition of "disability" as the SPD. (*Id.* at 201; Def.'s 56.1 ¶ 9.) It specifies further that "[f]or attorneys, 'regular occupation' means the specialty in the practice of law which the insured was practicing just prior to the date disability started." (FULCL at 201.) As to benefits determinations, the LTD Plan states, in roughly the same terms as the SPD, that "[i]n making any benefits determination under this policy, [First Unum] shall have the discretionary authority both to determine an employee's eligibility for benefits and to construe the terms of this policy." (*Id.* at 207.)

As in the SPD, the LTD Plan indicates that an employee's insurance may be terminated if "employment terminates" or upon "[c]essation of active employment." (*Id.* at 191.) Likewise, it states that

"misstatement of facts" will result in a "fair adjustment of premium" and that "the true facts will decide if and in what amount insurance is valid under this policy." (*Id.* at 188.)

### 2. Kellner's Resignation from Nixon

In approximately December of 2000, Nixon began to investigate Kellner for misappropriation of the firm's funds. (*Id.* at 539; *see also* Def.'s 56.1 ¶ 2.) On January 13, 2001, members of the firm confronted Kellner regarding the conduct. Six days later, on January 20, Kellner ceased working at the firm. (FULCL at 221 ("Personal Statement of Cynthia Kellner").)

Kellner wrote a letter to the firm on January 29, 2001 referencing "'alleged discrepancies' on [her] expense reimbursements . . . ." (*Id.* at 2.) She stated that she was "'tried and convicted' without any due process" and that "on January 23rd [she was] threatened with losing [her] law license . . . ." (*Id.* at 1.) The letter also stated that Kellner had "no intention of resigning from the Firm" and that "[t]he way I have been treated has caused me extreme emotional and mental distress as well as severely aggravating my physical disability." (*Id.* at 1-2.)

Approximately one month later, on March 22, 2001, Nixon's Benefits Manager, Donna Frank, sent a letter to First Unum asking two questions:

> If a . . . partner . . . meets the definition of disability under the Policy while a partner, [and] the partner subsequently terminates

3

employment during the 180 day elimination period, will the participant, assuming disability continues, be eligible to collect a disability benefit under the Policy notwithstanding the termination of employment?

Would the termination of employment impact coverage under the Policy in any way?

(Hack Decl. Ex. E at 1.)   First Unum responded on March 27, 2001, assuring Nixon that "[t]he determination of benefits is based on the disability date. If an employee is in an eligible class at the date of disability and meets the contract definition of disability, the employee would be eligible for benefits." (*Id.* Ex. E at 2.)

One day later, on March 28, 2001, Kellner executed a "Resignation, Settlement, and Release Agreement" with Nixon (the "Resignation Agreement" or "Agreement"). (FULCL at 59-62.)   The prefatory clauses of the agreement state that (1) "the parties wish to provide for a resolution of issues regarding the over-reimbursement of expenses to [Kellner] and to provide a full and complete resolution of any and all claims . . . . ," and (2) "for personal reasons, including her disabilities and their impact on her ability to practice law, [Kellner] finds it necessary to withdraw from [Nixon] . . . ." (*Id.* at 62.)

As part of the agreement, Kellner acknowledged that "she was over-reimbursed for certain business related expenses during 1999 and 2000 . . . ." (*Id.* at 61 ¶ 2.)   Both parties released "any and all claims of any nature whatsoever," but agreed that "[t]his

release . . . shall not include a waiver by [Kellner] of any rights she may have . . . under [Nixon's] Long Term Disability Policy . . . ." (*Id.* at 61 ¶ 4.)   Further, Kellner agreed to "release[] and discharge[ Nixon] from any obligations under the Firm Agreement, including any rights to receive continued income from the Firm because of disability." (*Id.*)   The Resignation Agreement stated that:

> [Nixon] acknowledges that [Kellner] may assert a claim for disability, either total or partial, under [Nixon's] existing disability insurance coverage. [Nixon] agrees that it shall not contest any such claim, but shall provide whatever materials or information ordinarily requested or required by its insurer in the course of the administration of any such claim.

(*Id.* at 60 ¶ 5.)   The Agreement then reiterated in its final paragraph that "[n]othing contained in this Agreement shall be construed or interpreted to be any waiver of [Kellner's] rights to apply for and receive long-term disability benefits under the group LTD policy under which she was covered during her partnership with the Firm." (*Id.* at 59 ¶ 10.)

3.   Kellner's Application for Benefits

On April 13, 2001, Kellner submitted her application for long-term disability benefits under the LTD Plan. (Pl.'s 56.1 ¶ 4; *see also* FULCL at 455-59.)   She wrote that: "I have "rheumatoid arthritis[ ("RA"),] which began in the Spring of 1999. I stopped working because of my RA on 1/19/01. I also have a significant history of hearing loss which began in 1985." (FULCL at 457.)   She also

4

asserted that her rheumatoid arthritis hindered her job duties because "fatigue impedes my performance, medications make me groggy, [and] unable to think as expected, [and] pain, stiffness make working impossible." (FULCL at 457.)

Significantly, Kellner did not disclose in her claim form any of the circumstances relating to her misappropriations, Nixon's investigation, or the Resignation Agreement. (Def.'s 56.1 ¶¶ 5, 35; *see also* Pl.'s 56.1 ¶ 5.) In fact, Kellner did not provide a copy of the Resignation Agreement to First Unum until *after* Defendant stopped paying her benefits in 2002. (Def.'s 56.1 ¶¶ 39-40; *see also* FULCL at 59-62 (attaching the Resignation Agreement to Kellner's November 26, 2002 appeal of Defendant's benefits determination).) Nonetheless, as part of her application for LTD benefits, Kellner signed a document titled "Disability Claim, Claimant's Authorization," and attested that: "The statements made by me are true and complete." (Def.'s 56.1 ¶ 13.)

### a. Medical Records

During its evaluation of her claim for benefits, First Unum examined medical records submitted by three of Kellner's treating physicians: Dr. Sharon J. Glezen, Dr. Tammi Sholtzhauer, and Dr. Jeffrey Levenkron. (*See* FULCL at 477.) In a memorandum dated June 8, 2001, Kristen Somerville of First Unum concluded that the records provided "[m]edical support for progressive [rheumatoid arthritis]." (*Id.* at 499.)

### i. Dr. Sharon Glezen

Dr. Sharon J. Glezen signed an "Attending Physician's Statement" on April 3, 2001, which was part of Kellner's initial application for benefits. (*Id.* at 455.) In that document, she opined that Kellner was "incapable of gainful employment in any capacity at this time." (*Id.*) Dr. Glezen also estimated that Kellner would be able to return to work on a part-time basis in February 2002. (*Id.*)

In addition to the "Attending Physician's Statement," Dr. Glezen provided documentation relating to Kellner's treatment, including her contemporaneous notes from at or near the time of Kellner's visits to her office. Significantly, Dr. Glezen's notes from a September 29, 2000 examination indicated that "[p]atient appears well" and that Kellner's "rheumatoid arthritis has been under good control . . . ." (*Id.* at 525.)

Following a January 22, 2001 appointment that took place shortly after Kellner's last day at Nixon, Dr. Glezen's notes state that "in the past several weeks [Kellner] has become increasingly frustrated with increasing hand, elbow and neck pain." (*Id.* at 514.) Describing the examination itself, she wrote that "I did not examine her neck today. There is no evidence of rheumatoid nodules about the elbows. There is [full range of motion] in both elbows. Hands reveal no evidence of obvious swelling or erythema at the current time." (*Id.*) Dr. Glezen's notes also indicate that Kellner was "[t]earful" and "appear[ed] quite fatigued." (*Id.*) Although the notes state that Dr. Glezen "strongly encouraged

[Kellner] to consider a medical disability in order to get her feet back under her" (*id.*), there is no indication that Kellner told Dr. Glezen that she had already stopped working at Nixon. Instead, Kellner apparently stated that "[s]he would like to go to work tomorrow to pull together a few loose ends . . . ." (*Id.*)

Dr. Glezen's notes dated January 30, 2001 indicate that Kellner's "[e]xamination was deferred." (*Id.* at 513.) The notes state that Kellner "had a very difficult week. When discussing her rheumatoid arthritis and disability with her coworkers some stressful situations have come up." (*Id.*)

On March 16, 2001, Dr. Glezen indicated that she counseled Kellner regarding her "recent flare" of arthritis and that it "will likely require long-term disability." (*Id.* at 510.) Dr. Glezen's notes dated March 27, 2001 — the day before Kellner executed the Resignation Agreement with Nixon — diagnose "[r]hematoid arthritis with a current flare." (*Id.* at 506.) The notes describe "difficulty ambulating," "increasing pain in both wrists," "increasing neck pain," "swelling of the right wrist," and "moderate swelling of both knees." (*Id.*) "She remains permanently disabled, and is in the process of discussing long term disability." (*Id.*) Finally, Dr. Glezen's notes from April 12, 2001 indicate that Kellner was moving "with difficulty and is using a cane." (*Id.* at 504.)

ii. Dr. Tammi Sholtzhauer

In a March 2, 2001 letter to Dr. Glezen regarding treatments administered to Kellner on that day, Dr. Sholtzhauer indicated that Kellner exhibited "severe" rheumatoid

arthritis and was "having a marked flare." (*Id.* at 481.) Dr. Sholtzhauer injected Lidocaine into both of Kellner's knees on that day. (*Id.*) The letter also stated that "[s]ince her last visit she's had a terrible time. She's had a lot of stress at work. She was discharged unfairly, and there are a lot of associated problems. Meantime, she's had an acute flare." (*Id.*)

A brief May 10, 2001 letter describing Dr. Sholtzhauer's appointment with Kellner states that Kellner "continues to have severe disease." (*Id.* at 478.) The letter states that Dr. Sholtzhauer observed "[s]ignificant swelling in [Kellner's] wrists and knees." (*Id.*)

iii. Dr. Jeffrey Levenkron

Dr. Levenkron is a clinical psychologist who provided counseling services to Kellner in eight sessions starting on January 29, 2001, just after her last day at Nixon and on the same day she wrote to the firm regarding "being 'tried and convicted' without any due process" (*id.* at 1). (*See id.* at 489.) In a letter dated May 10, 2001, Dr. Levenkron associated Kellner's symptoms of depression and anxiety with her rheumatoid arthritis: "Coupled with her severe pain and physical immobility, she was and continues to be disabled . . . ." (*Id.*) In that letter, he concluded that Kellner's "emotional state, in addition to her [rheumatoid arthritis] prevents her from returning to work." (*Id.* at 488.)

b. First Unum's Investigation

First Unum conducted a telephone interview with Kellner on April 20, 2001. (Def.'s 56.1 ¶ 15; *see also* FULCL at 463-

65.)  Kellner stated that she was diagnosed with rheumatoid arthritis in July 1999, that symptoms in her neck and knees worsened in December 1999, and that the illness had "escalated" since that time.  (FULCL at 465.) She also stated that Nixon "was accommodating [her medical condition] to the greatest extent they were able to . . . ." (Def.'s 56.1 ¶ 16.)  Kellner did not disclose the contents of the Resignation Agreement, including Nixon's agreement not to "contest" her disability claim.  (Def.'s 56.1 ¶ 18.)

On April 27, 2001, Kellner completed a First Unum form titled "Occupational Analysis," in which she indicated that her "Reason for Leaving Job" was "Rheumatoid arthritis and related medical problems." (Def.'s 56.1 ¶ 19.)  She did not describe the other circumstances of her departure from Nixon in the form.  (*See id.* ¶ 20; *see also* FULCL at 473.)

A First Unum field investigator, Robert Kolb, interviewed Kellner on May 23, 2001. (*See* Def.'s 56.1 ¶ 21; FULCL at 496.)  He observed swelling in Kellner's joints and face, and that she walked with a limp. (FULCL at 496.)  In a document dated May 30, 2001, Kolb reported that "[w]hen [Kellner was] asked for the reason she resigned, [she] stated it was due to her disability."  (Def.'s 56.1 ¶ 23.)  "[Kellner] stated [that] she continued to work until 1/20/01 when she could no longer continue due to fatigue and pain associated with the [rheumatoid arthritis]."  (FULCL at 497; *see also* Def.'s 56.1 ¶ 25.)  "She stated she was no longer a reliable partner in the firm and there was no where else she could have been placed due to her physical symptoms." (FULCL at 497.)  When Kolb asked "if the firm had any other positions available she could perform with her medical restrictions . . . ," Kellner "began to cry and stated she could not continue working because of her [rheumatoid arthritis] and furthermore, the firm had nothing available to her." (FULCL at 495; *see also* Def.'s 56.1 ¶ 24.)  Kellner did not mention the Resignation Agreement with Nixon during the interview.  (Def.'s 56.1 ¶ 26.)

On the same day Kolb interviewed Kellner, he also visited Nixon to continue his investigation of her claim.  (*See* FULCL at 492.)  Kolb's report states that Nixon employee Donna Frank "refused to provide any information regarding [Kellner's] resignation."  (*Id.*)  However, she did "confirm" that Kellner "was a partner with the firm . . . . " (*Id.*)  Frank did not allow Kolb to speak with anyone else at the firm, and suggested that First Unum send her a written list of its questions relating to the claim.  (*Id.*)[1]  Kolb observed that "it was obvious she was not being cooperative." (*Id.*)

_____

[1] There is limited evidence of participation by Nixon in Defendant's initial investigation of Kellner's benefits claim other than a response to a May 25, 2001 request regarding Kellner's earnings.  (*Id.* at 486.)  This is, of course, consistent with the terms of the Resignation Agreement.  (*Id.* at 60 ("The Firm Agrees that it shall not contest any such claim, but shall provide whatever materials or information ordinarily requested or required by its insurer in the course of the administration of any such claim.").)  Thus, although Nixon knew that Kellner had submitted a claim, it did not disclose the circumstances surrounding her departure from the firm to First Unum until after Kellner's benefits had initially been granted.

### c. First Unum's Grant of Kellner's Application

By letter dated June 8, 2001, Tracy Lynn Sawyer of First Unum approved Kellner's request for long-term disability benefits. (*Id.* at 501-02.) The letter stated that her first check, in the amount of $10,287.50, would be mailed on August 14, 2001. (*Id.* at 502.) First Unum projected payments to Kellner through November 22, 2020. (*See id.* at 500.)

### 4. Kellner's Disbarment

Although the details of the investigation conducted by New York State's Department of Attorney Grievances remain confidential (*see id.* at 540), the record reflects that on December 4, 2001, Kellner signed an affidavit that she submitted to the Fourth Department of New York State's Appellate Division. (*Id.* at 545-46.) The affidavit states that Nixon filed a complaint against her concerning "allegations that [Kellner] misappropriated law firm funds of approximately Sixty Thousand Dollars . . . and misappropriated client funds of approximately Sixty Thousand Dollars . . . that had been entrusted to [Nixon]." (*Id.* at 546 ¶ 4.)

Kellner "acknowledge[d] that the material allegations underlying the complaints are true and that [she did] not have a defense to the complaints." (*Id.* at 546 ¶ 5.) On January 25, 2002, the Fourth Department issued an Order accepting Kellner's resignation and directing her to "desist and refrain from the practice of law in any form . . . ." (FULCL at 547.)

### 5. First Unum's Reconsideration of Kellner's Eligibility for Benefits

In early- to mid-April 2002, First Unum learned for the first time that Kellner's claim might be fraudulent. (*See* Begos Decl. Ex. A at 947-49.) On April 15, 2002, Kellner's claim was reassigned from Tracy Lynne Sawyer to Karen Antoine. (*See* FULCL at 309-10.)

A May 15, 2002 email from one of Defendant's employees, with subject a field reading "Nixon Peabody LTD 452106," refered to a meeting with Nixon during which the firm

> hit us very hard on our inflexibility. . . .  What they are questioning is our inclusion of the $1.6 million reserve on a partner claim that they feel is fraudulent.  They stated that the DA's office is investigating her and once their investigation is complete, they feel we will change our mind about the claim.  With that being said, we still are obligated to pay this claim and include it in our renewal.

(Begos Decl. Ex. A at 1830.)[2]

### a. The Second Kolb Report

Robert Kolb submitted a second report regarding Kellner's claim, this time to Karen

---

[2]  The phrase "1.6 million reserve on a partner" refers to Kellner's claim.  A different document submitted by Kellner in connection with her opposition to the instant motion refers to a "$1.66 mill reserve – rheumatoid arthritis," and then lists a date of birth that matches the date provided by Kellner on her claim form.  (*Compare* Hack Decl. Ex. B at 1937, *with* FULCL at 459.)

Antoine, on June 26, 2002. (FULCL at 538-41.) While preparing the report, Kolb interviewed Dan Drake, the attorney from the Fourth Department's Grievance Committee that handled Kellner's disbarment proceeding. Drake told Kolb that "Kellner was aware of her legal situation and problems at the time [Kolb] met with her" in May 2001. (*Id.* at 540; *see also* Def.'s 56.1 ¶ 29.)

Kolb also spoke with members of Nixon on June 21, 2002. (FULCL at 538-40.) At that meeting, John Gehard, Managing Director of Nixon, told Kolb that members of the firm met with Kellner on January 13, 2001 after conducting an investigation into her activities. (*Id.* at 539; *see also* Def.'s 56.1 ¶ 31.) Gerhard characterized Kellner's claim for disability benefits as "an outgrowth of the whole process" of Nixon's investigation into her conduct: "[T]he claim 'came about' because Ms. Kellner knew she was about to loose [sic] her job, she needed money and she was 'driven by the need for money.'" (*Id.*)

Gerhard also indicated that the firm had decided to disclose Kellner's potentially fraudulent claim, despite waiting approximately a year to do so, because "[Kellner's] claim effected [sic] over 290 partners by increasing the annual premiums by 135% (or about $750,000) . . . [and] all the partners agreed it was in the [firm's] best interest to contact [First] Unum and let them investigate the validity of the claim." (FULCL at 539.) Finally, Gerhard told Kolb that the Monroe County District Attorney's Office had commenced a criminal

investigation relating to an alleged theft of client trust funds. (*Id.* at 538.)[3]

On June 26, 2002, Kolb emailed his report describing these conversations to Karen Antoine. (*Id.* at 541.)

### b. First Unum's Review of Kellner's Medical File

Dr. Thomas Reeder reviewed Kellner's medical file in connection with Defendant's re-evaluation of her disability claim. (FULCL at 562-63; *see also* Def.'s 56.1 ¶ 42.) In a memorandum dated July 9, 2002, Dr. Reeder observed that the January 22, 2001 examination by Dr. Glezen, two days after Kellner claimed she had become disabled, indicated that "[h]er knee pain had improved, elbow pain was normal [without] rheumatoid nodules," "[t]he hands showed 'no obvious swelling or erythema,'" "[m]edication regimen was unchanged," and that Kellner "planned to 'go to work tomorrow.'" (FULCL at 562.) He also noted that Kellner's arthritis was not addressed at Kellner's next visit on January 30, 2001. (*Id.*)

Dr. Reeder observed that, although Dr. Glezen's April 2, 2001 examination indicated that Kellner's disability began on January 20, 2001, Kellner's treatment closest to that date

---

[3]  Whether the May 15, 2002 email from Nixon or Gerhard's June 2002 statements constitute a breach of Nixon's obligations under the Resignation Agreement is neither relevant to the issue before the Court nor resolved by this Opinion. Nor does this Opinion address, or foreclose, the issue of whether Nixon's complicity in withholding relevant information from First Unum might support a separate cause of action against Nixon.

revealed a "good joint exam." (*Id.* at 562.) He concluded that Kellner had rheumatoid arthritis, but that she "clearly was not disabled," and that she "was stable and . . . functional" on January 20, 2001. (*Id.* at 562.)

### c. First Unum's Denial of Kellner's Benefits

First Unum terminated Kellner's benefits on July 12, 2002. (FULCL at 303-05; *see also* Def.'s 56.1 ¶¶ 47-48.) A memorandum on that date from Karen Antoine indicates that the changed decision was based on multiple discussions regarding new information received on the claim, as well as an additional medical review of Kellner's file. (FULCL at 564.) Antoine sent a letter to Kellner on the same day, which stated that First Unum had "only recently been able to complete [its] claim investigation," and that it had "concluded that [Kellner was] not entitled to disability benefits under the policy." (FULCL at 305.)

The letter stated that "[i]t appears that your termination of employment was due to choice either by you or by a mutual agreement between you and your employer and not due to disability." (*Id.* at 304-05.) First Unum noted that only the medical records in April 2001 strongly supported a finding of "disability" within the definition of the LTD Plan. (*Id.* at 304.) While Defendant acknowledged that Kellner did have rheumatoid arthritis, it stated that she was "stable and . . . functional at the date of claimed disability . . . ." (*Id.*) Finally, the letter "reserve[d] the right to pursue requesting the return of all benefits paid under this claim." (*Id.* at 303.)

### 6. Kellner's First Appeal

Kellner appealed First Unum's decision on November 26, 2002. (FULCL at 258; *see also* Def.'s 56.1 ¶ 52.) She argued that she had provided sufficient evidence of her disability under the terms of the policy (*id.* 235-37) and that her disbarment was "irrelevant" to First Unum's determination of her eligibility for benefits (at 232-35). With respect to the first argument, Kellner mainly objected to First Unum's failure to interview her treating physicians or conduct a medical examination, but she presented no additional medical records. (*Id.* at 235.) As to the disbarment, Kellner contended that it was a "subsequent condition," the occurrence of which did not terminate her entitlement to benefits due to rheumatoid arthritis. (*Id.* at 234.) She also argued that it was improper for First Unum to deny coverage "on the ground that Ms. Kellner is not able to practice law because she resigned from the practice of law." (*Id.* at 233.)

On January 13, 2003, First Unum conducted a "medical file review" relating to Kellner's appeal. As part of that process, First Unum reviewed the additional materials submitted by Kellner in support of her appeal, including personal statements from herself and her husband and the Resignation Agreement with Nixon. (*See* Def.'s 56.1 ¶¶ 59-60; Pl.'s 56.1 ¶¶ 59-60.)

The doctor that conducted the review of her medical file, Donna J. Carr, concluded that "[t]he new information [submitted by Kellner] does not change the prior [medical opinion dated July 29, 2002,] as [Kellner's] physical exams did not indicate a worsening of her [rheumatoid arthritis] as of the [date of

disability]. There was no exacerbation of her disease process at the time [Kellner] left work." (FULCL at 612.)

First Unum notified Kellner that her appeal was denied on February 13, 2003. (*Id.* at 615-618.) The denial letter indicated that Defendant had reviewed Kellner's entire file and it summarized Dr. Carr's assessment of her medical records. (*Id.* at 617.) Regarding Dr. Shlotzhauer, First Unum concluded that Kellner had reported she was "doing very well" in her November and December 2000 visits. (*Id.*) Defendant also characterized Shlotzhauer's January 22, 2001 report as "reflect[ing] a relatively stable condition." (*Id.*) Turning to Dr. Glezen's April 3, 2001 "Attending Physician's Statement" (*id.* at 455), First Unum concluded that Glezen's findings were not supported by her January 22, 2001 examination, in which she indicated that she planned to work the following day. (*Id.* at 617.)

In light of this review, First Unum concluded that the "impending investigation and termination" caused increased symptoms, and that "reasonable restrictions" would have permitted her to continue working at Nixon as an attorney. (*Id.*) The letter then stated that Kellner's disability coverage terminated when she stopped working at Nixon on January 20, 2001, and that "any subsequent worsening of her condition would not be covered . . . ." (*Id.* at 616.) In light of that analysis, First Unum asserted that "an overpayment ha[d] been made on [Kellner's] claim and [it] reserve[d the] right to collect any overpayment." (*Id.* at 615.)

### 7. Kellner's Second Appeal

On March 10, 2003, Kellner, through her counsel, again sought reconsideration of First Unum's determination. (*Id.* at 625-26.) The letter challenged Defendant's assessment of the medical records, and also asserted, for the first time, that the Social Security Administration's ("SSA") April 18, 2001 determination that Kellner was disabled (*see id.* at 621-22) conflicted with Defendant's eligibility determination. (*Id.* at 625-26.)

On March 19, 2003, First Unum wrote to Kellner's counsel indicating that it had completed another review of its benefits determination and decided to uphold the February 13, 2003 decision. (*Id.* at 628-29; *see also* Def.'s 56.1 ¶ 63.) First, Defendant noted that it followed different definitions and procedures than the SSA. (FULCL at 262-63.) Second, Defendant stated that:

> Ms. Kellner's medical condition was stable at the time she stopped working on January 20, 2001 and there is no medical evidence to support that her condition worsened on that date. The only thing that changed is the fact that Ms. Kellner's employer was beginning an investigation into her work conduct.

(*Id.* at 628.) The letter reiterated that First Unum reserved the right to "collect any overpayment made to Ms. Kellner," and stated that she had "exhausted all administrative remedies in regard to her appeal for disability benefits." (*Id.*)

11

B. Procedural History

Kellner commenced this action on July 24, 2003. First Unum timely answered and asserted its counterclaim.

On December 22, 2003, the Honorable Richard C. Casey, District Judge, ordered discovery for the "limited purpose of determining (a) whether a conflict of interest existed with respect to the denial of benefits and (b) whether such a conflict affected the administrator's decision." (Order dated Dec. 22, 2003 (Doc. No. 54).)

On August 11, 2004, the Honorable Ronald L. Ellis, Magistrate Judge, issued an order compelling First Unum to respond to some of Kellner's discovery requests relating to potential conflicts of interest. Magistrate Judge Ellis denied First Unum's motion for reconsideration of the Discovery Order on October 14, 2004.

First Unum next lodged objections to Magistrate Judge Ellis's Order pursuant to Rule 72 of the Federal Rules of Civil Procedure. Following additional briefing on the motion, the Honorable Kenneth M. Karas, District Judge, held oral argument on May 3, 2005. Judge Karas's rulings at the argument were embodied in a joint discovery plan submitted by the parties.

Under the joint discovery plan, Defendant agreed to provide statistical information relating to claims processing, claims in litigation, and appellate review of claims decisions, from 2001 to 2003; claims manuals in effect on May 30, 2001 and July 17, 2002; and information relating to the people involved in handling Kellner's claim.

(Joint Discovery Plan dated June 13, 2005 (Doc. No. 26).) Judge Karas adopted the plan and ordered that discovery be completed by September 15, 2005. (*Id.*)

Following the completion of this discovery, First Unum moved for summary judgment. The case was reassigned to the undersigned on September 4, 2007. After an April 3, 2008 status conference, Kellner submitted a letter on May 9, 2008 discussing additional legal precedent bearing on her opposition to Defendant's motion and requesting that those materials be added to the record. The Court denied Kellner's application on May 27, 2008. However, at Kellner's request, the Court reserved decision on the summary judgment motion in light of *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), which was pending before the Supreme Court at that time.

By letter dated June 30, 2008, and based on the Supreme Court's June 19, 2008 decision in *Glenn*, Kellner requested additional discovery, "supplementation of the record[,] and [additional] briefing in opposition to Defendant's summary judgment motion." (Pl.'s Letter dated June 30, 2008 at 1.) The Court held a pre-motion conference on August 11, 2008, at which it directed Kellner to submit a letter setting forth the additional discovery sought and the materials Kellner wished to add to the record in this case. (Order dated Aug. 11, 2008 (Doc. No. 52).)

Kellner's September 5, 2008 submission requested "additional '*Glenn*' discovery" that was "aimed at demonstrating company-wide improper practices" at First Unum. (Pl.'s Letter dated Sept. 5, 2008 at 1-2.) Kellner

also requested that certain attached materials be added to the record, including settlement agreements affecting First Unum, documents relating to Defendant's financial goals, a law review article, and certain pre-*Glenn* case citations. (*See id.* at 3 & Exs. E-L.)[4] The Court has considered the materials appended to Kellner's September 5, 2008 letter in connection with the following analysis of Defendant's motion for summary judgment.

## II. KELLNER'S ADDITIONAL DISCOVERY REQUESTS

Kellner argues that the Supreme Court's holding in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), entitles her to additional discovery relating to First Unum's "history of biased decision-making and the existence and/or quality of the firewalls, if any, erected between the claims administrators and those interested in Defendant's finances . . . ." (Pl.'s Letter dated Sept. 5, 2008 at 2.) For the reasons stated below, Kellner's request is denied.

---

[4] Specifically, Kellner submitted the following: a report of the Targeted Multistate Market Conduct Examination reflecting a December 31, 2002 "Initial Review" and a February 29, 2004 "Follow-Up Review" (Pl.'s Letter dated Sept. 5, 2008 Ex. E); an unsigned settlement agreement listing California and Unum as parties and dated October 2005 (*id.* Ex. F); a Report of the Multistate Market Conduct Examination as of December 31, 2007 (*id.* Ex. G); a law review article by Yale Law School Professor John H. Langbein, entitled "Trust Law As Regulatory Law: The Unum/Provident Scandal And Judicial Review Of Benefit Denials Under ERISA" (*id.* Ex. H); certain emails dated July 25, 2002 (*id.* Ex. I); a spreadsheet with an illegible date, bates-stamped A-144, A-326, and A-328 (*id.* Ex. J); a June 9, 1995 Provident memorandum (*id.* Ex. K); and an October 2, 1995 Provident memorandum (*id.* Ex. L).

The Court notes that Kellner failed to comply with the procedural requirements for seeking additional discovery while opposing a pending summary judgment motion. *See* Fed. R. Civ. P. 56(f). "To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004). Kellner did not comply with the Rule and is not entitled to discovery on that basis alone. *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994). Nonetheless, because the Court invited, to some extent, the format of Kellner's September 5, 2008 submission, it considers the substance of Kellner's requests.

The procedural defect in these requests notwithstanding, Kellner is not entitled to the requested discovery. First, Kellner has already had ample opportunity to develop the type of information she now seeks. From the outset of this case the Court has permitted Kellner to explore First Unum's alleged conflict of interest. On December 22, 2003, Judge Casey noted that the circumstances of this case "necessitat[ed] limited discovery on the issue of conflict of interest." (Order dated Dec. 22, 2003 (Doc. No. 54).) The subsequent rulings of Magistrate Judge Ellis and Judge Karas provided Kellner with additional opportunities to develop evidence relating to any conflict of interest existing at First Unum at the time it determined Kellner's eligibility for benefits.

Second, *Glenn* does not entitle Kellner to this discovery. Kellner requests five categories of discovery relating, in her view, to "[e]xactly the type of evidence that the Supreme Court [in *Glenn*] specifically indicated must be considered by district courts . . . ." (Pl.'s Letter dated Sept. 5, 2008 at 2.)[5]  However, *Glenn* does not require courts to reopen discovery and engage in the type of duplicative efforts now sought by Kellner.  To the contrary, the Supreme Court simply made clear what has largely been assumed in this matter, that "the existence of . . . a conflict is a factor to be weighed by a court when reviewing the denial of benefits, the significance of which will vary depending upon other circumstances." *Hogan-Cross v. Metro. Life Ins. Co.*, 568 F. Supp. 2d 410, 413 (S.D.N.Y. 2008).

Here, sufficient discovery relating to the conflict has already taken place for the Court to consider this factor. *See Gualandi*, 385 F.3d at 245 (upholding district court's denial of plaintiff's discovery requests where requested material would not have precluded summary judgment).  Thus, for the reasons set forth below, after considering all the

---

[5]   Kellner's first three requests seek access to documents from other cases to which Defendant's parent company is a party. (Pl.'s Letter dated Sept. 5, 2008 Ex. C at 4 (requesting materials from *Merrick v. Paul Revere Ins. Co.*, No. 00 Civ. 731 (JCM) (RJJ) (D. Nev.) and *Keir v. UnumProvident Corp.*, No. 02 Civ. 8781 (DLC) (S.D.N.Y.)).)  The fourth request seeks documents maintained by Defendant relating to "results of the claims operation, numbers or denials, terminations, or closures, and/or net termination ratios." (*Id.* Ex. C at 5.)  Kellner's fifth request seeks "[a]ny documents indicating the creation of a separation, firewall or other measure or program to implement . . . the Regulatory Settlement Agreements . . . entered into between Defendant[] and the States in 2004 . . . ." (*Id.*)

evidence before it, the Court finds that this is not a case where the other factors bearing on the review of First Unum's benefits determination are "closely balanced" such that consideration of the alleged conflict is necessary to "act as a tiebreaker." *Glenn*, 128 S. Ct. at 2350.  As such, the Court finds that additional discovery relating to this topic, which has already been explored, would not be a fruitful endeavor at this time. Accordingly, Kellner's request for additional discovery is denied.

III.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Having resolved the pending discovery requests, the Court now addresses Defendant's motion.  The standard of review is well settled:  the moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). Pursuant to Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Matican v. City of New York*, 524 F.3d 151, 154 (2d Cir. 2008).

"A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment is

unwarranted if "the evidence is such that a reasonable jury could return a verdict for the non-moving party").

Applying these standards, the Court grants Defendant's motion for summary judgment with respect to Kellner's claim against it, but denies the motion as to its counterclaim and the application for fees and costs.

## A. Kellner's Wrongful Denial Of Benefits Claim

Kellner argues that the Court should review under a *de novo* standard First Unum's denial of her benefits, primarily because she believes First Unum's conflict of interest directly affected its determination. Next, Kellner argues that, even if deferential review of the determination is appropriate, Defendant abused its discretion. For the reasons stated below, the Court finds that Defendant's interpretation of the LTD Plan and its benefits determination must be reviewed only for an abuse of discretion. The Court finds that, even after taking into consideration the evidence of a conflict of interest, First Unum's ultimate conclusion regarding Kellner's claim was supported by substantial evidence. Therefore, Defendant's motion is granted.

### 1. Applicable Law

Kellner makes several arguments for *de novo* review, but her principal contention is that Defendant's inherent conflict of interest affected its determination of her eligibility for benefits. (*See* Pl.'s Opp'n at 11.) All of Kellner's arguments fail in light of *Glenn*, however, which requires under these

circumstances that the Court review First Unum's decision deferentially. Accordingly, in reviewing Kellner's claim that Defendant wrongfully terminated her benefits, the Court applies the abuse of discretion standard as defined by the Second Circuit, *see Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)), and as informed by the *Glenn* Court's analysis.

"Principles of trust law require courts to review a denial of plan benefits 'under a *de novo* standard' unless the plan provides to the contrary." *Glenn*, 128 S. Ct. at 2348 (quoting *Firestone*, 489 U.S. at 115). However, "[w]here the plan provides to the contrary by granting 'the administrator or fiduciary discretionary authority to determine eligibility for benefits . . . [t]rust principles make a deferential standard of review appropriate' . . . ." *Id.* (quoting *Firestone*, 489 U.S. at 115); *see also Krauss*, 517 F.3d at 622.

The LTD Plan conferred sufficient discretion upon First Unum to make deferential review appropriate. The Plan states that "[i]n making any benefits determination under this policy, [First Unum] shall have the discretionary authority both to determine an employee's eligibility for benefits and to construe the terms of this policy." (FULCL at 207.)[6]   The SPD

---

[6] In her 56.1 statement, Kellner argues that "[t]here is nothing in Defendant's claim file indicating that Nixon 'gave' First Unum full discretionary authority. Only First Unum's signature appears on the Policy." (Pl.'s 56.1 ¶ 10.)   Nonetheless, as other courts have found based on similar facts, "[t]here being no evidence that [the employer] ever rejected or repudiated the

includes similar terms. (*Id.* at 158.) Courts reviewing this language have repeatedly found it sufficient to justify deferential review of the underlying benefits determination. *See, e.g.*, *Henar v. First Unum Life Ins. Co.*, No. 02 Civ. 1570 (LBS), 2002 WL 31098495, at *3 & n.8 (S.D.N.Y. Sept. 19, 2002); *Rosenthal v. First Unum Life Ins. Co.*, No. 00 Civ. 3204 (LLM), 2002 WL 975627, at *5 (S.D.N.Y. May 9, 2002). Therefore, the Court reviews First Unum's benefits determination for an abuse of discretion. *See Glenn*, 128 S. Ct. at 2348.

With respect to Kellner's argument regarding Defendant's conflict of interest, the Court considers it as "'but one factor among

---

Discretionary Clause aspect of the LTD Plan documentation proffered by [the defendant insurer]," the Court finds that the discretionary language "is properly considered a Plan term and that it applies to [the defendant's] fiduciary determinations" under the LTD Plan. *Cohen v. Metro. Life Ins. Co.*, 485 F. Supp. 2d 339, 348 (S.D.N.Y. 2007).

Kellner also contends that promulgations by the National Association of Insurance Commissioners ("NAIC") and the New York State Insurance Department suggest that the Court should disregard the LTD Plan's discretionary language clause. (Pl.'s Opp'n at 14-15.) The Court is not persuaded. *See Morgenthaler v. First Unum Life Ins. Co.*, No. 03 Civ. 5941 (AKH), 2006 WL 2463656, at *3 (S.D.N.Y. Aug. 22, 2006) (rejecting similar arguments). The NAIC's Model Regulations and its conclusions regarding discretionary language clauses in insurance contracts are not binding on the Court in considering an ERISA claim regarding an LTD Plan. *See id.*; *see also Peck v. Aetna Life Ins. Co.*, 495 F. Supp. 2d 271, 275-76 (D. Conn. 2007) (rejecting reliance on NAIC findings). Nor is the Court prepared to disregard the language of such a clause when the Supreme Court has recently provided it with specific and unqualified instructions to the contrary. *See Glenn*, 128 S. Ct. at 2347 (citing *Firestone*, 489 U.S. at 115).

many that a reviewing judge must take into account,' but it does not imply or require a change in the standard of review 'from deferential to *de novo* review . . . .'" *Curry v. Am. Int'l Group, Inc. Plan No. 502*, No. 06 Civ. 8319 (MGC), 2008 WL 4202488, at *6 (S.D.N.Y. Sept. 11, 2008) (quoting *Glenn*, 128 S. Ct. at 2350-51); *see also Badawy v. First Reliance Standard Life Ins. Co.*, No. 04 Civ. 1619 (RJH), 2008 WL 4449475, at *5 (S.D.N.Y. Sept. 30, 2008) ("*Glenn* . . . overturns Second Circuit law providing for *de novo* review when plaintiff can demonstrate that the conflict actually influenced the benefits determination.").

Under the deferential standard, an administrator abuses its discretion if its decision "was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Krauss*, 517 F.3d at 623-24 (quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002)). In particular, "[s]ubstantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'" *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).

Although the application of the deferential standard of review is largely the same, one of the primary effects of *Glenn* is that, at least under the circumstances of this case, it is now appropriate to consider evidence of the administrator's conflict. *Cf. Hogan-Cross*, 568 F. Supp. 2d at 413-14 (reasoning that the defendant's argument that "discovery is inappropriate . . . because 'there

16

is no evidence in the administrative record of any actual conflict,' a dubious proposition to begin with before *Glenn*, is misguided.'"). Thus, the Court is mindful that:

> review of a determination under th[is] standard is more than [a] perfunctory review of the factual record in order to determine whether that record could conceivably support the decision to terminate benefits. Rather, such a review must include a searching and careful determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rational and not arbitrary.

*Rappa v. Connecticut Gen. Life Ins. Co.*, No. 06 Civ. 2285 (CBA), 2007 WL 4373949, at *9 (E.D.N.Y. Dec. 11, 2007) (quoting *Rizk v. Long Term Disability Plan of Dun & Bradstreet Corp.*, 862 F. Supp. 783, 789 (E.D.N.Y. 1994)).

### 2. Analysis

Kellner makes several arguments in support of her position that Defendant wrongfully terminated her disability benefits. She argues that evidence from her attending physician, the SSA, and her own subjective complaints of pain all demonstrate that she was "disabled" under the terms of the LTD Plan. Next, she argues that she has sufficiently demonstrated that she is unable to perform the material duties of her occupation. (Pl.'s Opp'n at 29-34.) For the reasons stated below, the Court finds these arguments unavailing and, after considering all the factors bearing on First Unum's determination, concludes that there was no

abuse of discretion in terminating Kellner's disability benefits.

First, the opinions of Kellner's attending physicians are not entitled to special deference. Administrators are not required "to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Dr. Reeder's review of the claim file in connection with Defendant's July 12, 2002 termination of Kellner's benefits reflects that he considered the records and evaluations of her attending physicians and concluded that Kellner had rheumatoid arthritis, but that she was "stable [and] . . . functional" at the date she claimed her disability started. (FULCL at 562.) Opposing this opinion, Kellner emphasizes her physicians' notes from March and April 2001, as well as a November 18, 2002 "narrative statement" from Dr. Glezen. (Pl.'s Opp'n at 28.) All of these records are dated well after January 20, 2001 — the date Kellner claims she became disabled. Accordingly, it was not an abuse of discretion for Defendant to rely on Dr. Reeder's analysis of Kellner's pre-January 20, 2001 medical records rather than treating the after-prepared notes of Kellner's physicians as dispositive of Kellner's condition.

Second, Kellner's argument that both Defendant and the Court must defer to the SSA's determination that she is disabled is meritless. Because "[t]he term 'disability' has a variety of meanings, depending on the context in which it is used," the SSA's finding that Kellner was "disabled" is not

binding on Defendant. *Kunstenaar v. Connecticut Gen. Life Ins. Co.*, 902 F.2d 181, 184 (2d Cir. 1990). Nor will the Court substitute the SSA's disability finding in the place of its own judgment as to whether Defendant abused its discretion. *See Gaitan v. Pension Trust Fund of Pension, Hosp. and Benefit Plan of the Elec. Indus.*, No. 99 Civ. 3534 (NRB), 2000 WL 290307, at *5 (S.D.N.Y. Mar. 20, 2000) ("An ERISA plan's determination on a disability claim that differs from that of the Social Security Administration is not arbitrary and capricious so long as the plan's finding is reasonable and supported by substantial evidence.").

Kellner also argues that a "Regulatory Settlement Agreement" involving First Unum, New York, Tennessee, Massachusetts, Maine, and the United States Department of Labor requires Defendant to afford greater deference to the SSA. However, this agreement was not executed until November 2004 — two years after the benefits determination now contested by Kellner. Whatever the agreement's effect on LTD plan determinations occurring after it was executed, Defendant was not bound by its terms when it terminated Kellner's benefits in July 2002. *See Troy v. Unum Life Ins. Co. of Am.*, No. 03 Civ. 9975 (CSH), 2006 WL 846355, at *10 (S.D.N.Y. Mar. 31, 2006) (declining to consider the Regulatory Settlement). Thus, neither the SSA's determination nor the provisions of the Regulatory Settlement Agreement require a finding that First Unum abused its discretion.

Third, while Kellner's statements regarding her pain are relevant to her eligibility for benefits, "acceptance of [P]laintiff's subjective complaints [of pain is]

. . . by no means required of the administrator." *Maniatty v. UnumProvident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2004); *see also Lee v. Aetna Life and Cas. Ins. Co.*, No. 05 Civ. 2960 (PAC), 2007 WL 1541009, *5 (S.D.N.Y. May 24, 2007). First Unum was entitled to rely on its independent medical reviewers' opinions regarding the medical records in Kellner's claim file; no "in-person, physical examination of Kellner" was necessary. *Fitzpatrick v. Bayer Corp.*, No. 04 Civ. 5134 (RJS), 2008 WL 169318, at *14 (S.D.N.Y. Jan. 17, 2008). Moreover, in light of Kellner's failure to disclose facts regarding the circumstances of her departure from Nixon, which damaged her credibility, First Unum's subsequent decision not to credit her subjective complaints of pain was not an abuse of discretion.

Kellner's final argument — that she has demonstrated an inability to perform the material duties of her occupation — is directly at odds with Defendant's conclusion in terminating her benefits. By letter dated July 12, 2002, based upon a full review of her claim file, First Unum found that Kellner was not "disabled" under the terms of the LTD Plan. (*See* FULCL at 565-67.) The letter stated that Kellner's claim file had been previously incomplete because she did not disclose the circumstances or timing of her departure from Nixon. It also noted that Kellner worked full-time, without absenteeism or accommodations from Nixon, through her last day at the firm. Finally, it quoted the LTD Plan's definition of "disability," which requires that any limitations on the claimant's performance of the "material duties of [her] regular occupation" arise "*because of injury or*

*sickness*." (*Id.* at 566 (emphasis in original); *see also id.* at 154 (defining "disability").)

First Unum concluded that Kellner was not entitled to benefits because there was insufficient evidence that her arthritis *caused* her to be unable to perform the material duties of her job. Based on the terms of the Resignation Agreement, Kellner's disbarment proceedings, and an investigatory interview at Nixon, Defendant found that issues other than her physical symptoms had caused her to stop working. In light of the facts in the record, it cannot be said that this decision was an abuse of Defendant's discretion.

Similarly, Defendant's February 13, 2003 denial of Kellner's appeal was based on a review of the SSA's findings and an additional medical file review by a different physician. (FULCL at 615-18.) The letter applied similar reasoning in concluding that Kellner was not "disabled" within the meaning of the LTD Plan. Defendant first reasoned that the April 3, 2001 conclusion of Kellner's attending physician, Dr. Glezen, was "not supported by the January 22, 2001 examination and Ms. Kellner's plan to go to work the next day." (*Id.* at 617.) Therefore, Defendant reasoned, Kellner was not "precluded from performing her occupation as an attorney" by her claimed disability when she stopped working at Nixon. (*Id.*)

Thus, Defendant concluded that, pursuant to the termination provision of the LTD Plan, Kellner's disability coverage ended upon her "[c]essation of active employment" when she left the firm, and that she had not satisfied the LTD Plan's definition of "disability" prior to that date. (*Id.* at 616.) Therefore, the

Defendant found that Kellner was not entitled to disability benefits. Kellner's contrary interpretations of the medical records are insufficient to avoid summary judgment.

Kellner repeatedly asserts that the there are only two issues in this case: the material duties of her job and whether her arthritis prevented her from performing those duties. (*See* Tr. at 31-32; Pl.'s 56.1 ¶¶ 2, 3, 6, 14, 17.) This argument is both legally and factually incorrect. The legally material issue raised by the instant motion is whether Defendant abused its discretion in determining whether Kellner was not "disabled" under the LTD Plan. *See Glenn*, 128 S. Ct. at 2348, 2350. Factually, Kellner's argument ignores a key component of the LTD's definition of disabled: "'Disability' . . . means that *because of injury or sickness* . . . the insured cannot perform the material duties of his [or her] occupation . . . ." (FULCL at 201 (emphasis added).)

In its letter denying Kellner's benefits, First Unum emphasized the lack of causation between the onset of Kellner's claimed disability and her departure from Nixon. (FULCL at 304.) It was not an abuse of discretion to conclude that Kellner left the firm — and was therefore unable to perform the material duties of her occupation — not because of her illness, but because of the accusations of misappropriation, her impending disbarment, and the subsequent Resignation Agreement. Indeed, the Court finds that conclusion well supported by the record.

Nevertheless, following discovery on the conflict issue, Kellner submitted additional

evidence, not contained in the claim file, suggesting that Defendant's conflict of interest may have affected First Unum's exercise of discretion. (Hack Decl. Exs. A, B, C; *see also* Pl.'s Letter dated Sept. 5, 2008 Exs. E-L.) This evidence raises a question as to whether First Unum's conflict of interest caused it to abuse its discretion when determining Kellner's eligibility for benefits. *See Glenn*, 128 S. Ct. at 2350 ("[A] legal rule that treats insurance company administrators . . . alike in respect to the existence of a conflict can nonetheless take account of the circumstances . . . [of] the conflict in individual cases."). The Court must now consider this evidence and weigh its importance relative to the other factors and evidence underlying First Unum's benefits determination.

Kellner first argues that Defendant identified its account with Nixon as a "potential time bomb," and that her claim "was just the 'time bomb' that would . . . wipe out all [Defendant's] profits on the [Nixon] account." (Pl.'s Opp'n at 6.) However, the document cited by Kellner is part of a December 1, 2000 memorandum that predates Defendant's initial determination that she was entitled to benefits. (*See* Begos Decl. Ex. A at 2160-62.) Kellner provides no explanation for why a December 2000 statement would have caused First Unum to subsequently deny her benefits after it initially determined that she was eligible. The document therefore provides little evidence that Defendant abused its discretion.

Second, Kellner points to emails dated April 15, 2002 suggesting that, during Defendant's renegotiation of its contract with

Nixon, her claim was targeted for reassessment. (*See* Pl.'s Opp'n at 7; Hack Decl. Ex. B at 1937-38.) The Court finds these circumstances troubling. Nonetheless, these emails do not establish that the "high-dollar value" of Kellner's claim *caused* First Unum to terminate her benefits.

Robert Kolb's second investigative interview was conducted three months after these emails, on June 21, 2002. There is also evidence in the record that it was Nixon's financial concerns — not First Unum's — that led Kellner's claim to be reassigned to Karen Antoine and reassessed by Dr. Reeder. (*See* FULCL at 539.) Lastly, at oral argument Kellner conceded that the information relating to Kellner's misconduct, including her January 25, 2002 disbarment, justified Defendant's reevaluation of her claim. (Tr. at 33.)

Moreover, the troubling nature of the correlation between these emails and Defendant's re-evaluation of Kellner's claim is tempered by other contemporaneous emails suggesting that at least some of Defendant's employees urged caution and deliberation with respect to its reassessment of Kellner's eligibility for benefits. For example, an April 12, 2002 email referring to Kellner's claim stated that "a thorough medical evaluation" was required and that "there's always the possibility that it is a fraudulent claim, but the investigation could take some time." (Begos Decl. Ex. A at 947.) On May 1, 2002, a First Unum employee sent an email stating that: "[W]e are still obligated to pay [Kellner's] claim and include it in our renewal." (*Id.* Ex. A at 1830.) Finally, Kellner was permitted to depose Karen Antoine, the First Unum employee

responsible who performed the initial reevaluation of Kellner's claim. The deposition led to no evidence that Antoine was specifically affected by financial pressure arising out of Defendant's negotiation of the Nixon account. (*See* Hack Decl. Ex. A ("Antoine Dep. Tr.") at 88-93, 115.) Thus, the evidence of a potential conflict affecting Kellner's claim does not outweigh the other evidence supporting Defendant's determination that Kellner was not entitled to benefits under the LTD Plan.

Kellner's additional arguments that Defendant's conflict improperly affected its conclusion are based on documents produced during discovery, as well as certain instances of absent documentation. For the most part, this evidence relates to Karen Antoine's handling of Kellner's claim and the subsequent denial of Kellner's appeal. (*See* Pl.'s Opp'n at 8-11.) First, Antoine's July 1, 2002 "projection" does not prove that she pre-judged Kellner's claim without the benefit of an additional review of the medical file. Antoine testified that she only used the word "projection" to indicate that she expected to make "some kind of decision on [the claim] in July." (Antoine Dep. Tr. at 97-98.) Second, Kellner's arguments relating to the timing of the drafting of both the July 13, 2002 denial letter and the February 13, 2003 denial of her appeal prove little. Both letters incorporate the reasoning of the respective underlying medical evaluations and are consistent with the independent reviewers' assessment of her medical file.

Even assuming that First Unum shared parallel financial incentives with Nixon regarding Kellner's claim because it wanted to keep the firm's business, that fact is not enough to overturn its denial of her benefits. Ultimately, the Court must assess whether any such conflict caused Defendant to abuse its discretion in making the actual benefits determination. Based on the record before the Court, the fact that financial considerations may have caused First Unum to reevaluate Kellner's claim is insufficient to lead to that conclusion. The record amply supports Defendant's ultimate finding that Kellner was not "disabled" within the meaning of the LTD Plan at the time she filed her claim for benefits.

Finally, Kellner's broad arguments relating to First Unum's general claims handling procedures merely support the conclusion reached in *Glenn*: insurance companies that both pay benefits to beneficiaries and determine eligibility under LTD Plans operate under a general conflict of interest. *See Glenn*, 128 S. Ct. at 2349-50. The supplemental materials submitted in connection with Kellner's September 5, 2008 letter suggest that First Unum's practices may have, as a general matter, resulted in a larger conflict of interest than that existing at other professional insurance companies. However, none of these materials bear directly on First Unum's determinations of Kellner's entitlement to benefits under the LTD Plan.[7]

---

[7]   Former First Unum employee Dominick V. LaGravinese's assertion that Karen Antoine's testimony with respect to her July 2002 "projection" was inaccurate (LaGravinese Decl. ¶ 9), as well as other criticisms relating to her processing of Kellner's claims (*see id.* ¶¶ 10, 13, 15), is of limited probative value to the issues before the Court. LaGravinese's characterizations of deposition testimony that he did not observe, which was offered by a witness whom he has never met, regarding events of which he has no first-hand knowledge, are entitled to little weight. *See*

Having considered this general evidence, as well as the other evidence of a potential conflict of interest, the Court finds that Defendant's decision was supported by substantial evidence. *See Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 584 (8th Cir. 2008) ("Although [defendant] was operating under a conflict of interest when it denied [the plaintiff's] claim, the remaining facts in the case indicate that it did not abuse its discretion.").

Put simply, the other factors bearing on Defendant's denial of benefits do not result in a close question for which the conflict of interest might serve as a "tiebreaker" in the Court's decision. *Glenn*, 128 S. Ct. at 2351. These factors include:   (1) Kellner's December 4, 2001 resignation from the legal profession, her admission of misconduct, and her January 25, 2002 disbarment, events that Kellner concedes justified Defendant's reevaluation of its eligibility determination (*see* 4/16/08 Tr. at 33); (2) Kellner's material omissions and outright misstatements during the initial benefits determination, which were relevant to whether she was actually "disabled" under the LTD Plan, as well as her general credibility; (3) the results of two separate analyses of her medical treatment records by Defendant's independent medical examiners (*see* FULCL at 562-63, 612-13); (4) the differences between Kellner's doctors' notes regarding appointments that

took place in and before January 2001 and later records containing *ex post* assessments of her condition at the time she claims she became disabled;[8] and (5) the Resignation Agreement, which was not provided to Defendant until after Kellner was initially granted benefits, in which both Kellner and Nixon agreed that she "may assert a claim for disability . . . [and that t]he firm . . . [would] not contest any such claim" (FULCL at 60 ¶ 5).   These factors provide substantial evidence supporting First Unum's benefits determination, and it did not abuse its discretion in reaching that conclusion. Accordingly, Defendant's motion for summary judgment on Kellner's claim against it for wrongful termination of benefits is granted.

### B. First Unum's Counterclaim

Defendant also moves for summary judgment on its counterclaim to recover the benefits it paid to Kellner. (*See* Def. Mem. at 17.)   In response, Kellner argues that Defendant is seeking legal restitution, which is unavailable under ERISA. (Pl.'s Opp'n at 36.)   For the reasons stated below, Defendant's motion is denied.

---

*Rosenthal v. First Unum Life Ins. Co.*, No. 00 Civ. 3204 (LMM), 2004 WL 97696, at *1 (S.D.N.Y. Jan. 20, 2004); *see also Yaw v. First Unum Life Ins. Co.*, No. 03 Civ. 2755 (WMS), 2006 WL 839420, at *2 n.3 (W.D.N.Y. Mar. 28, 2006) (noting that courts have rejected a similar affidavit because the affiant "was not involved in the handling of the plaintiff's application for benefits").

---

[8]  For example, Dr. Glezen's March 2001 notes refer to a "recent flare" (FULCL at 510) and "current flare" (*id.* at 506) of Kellner's symptoms.   Dr. Shlotzhauer's March 2, 2001 letter states that Kellner was "discharged unfairly" and that in the "[m]eantime, she's had an acute flare."   (*Id.* at 481.)   These comments provide substantial evidence to support First Unum's finding that, to the extent Kellner was ever "disabled" under the terms of the LTD Plan, the disability began after her "[c]essation of active employment" at Nixon. (*Id.* at 565; *see also id.* at 516 (citing LTD Plan).)

### 1. Applicable Law

Under ERISA's section 502(a)(3), a plan fiduciary may bring a civil action "to obtain . . . appropriate equitable relief . . . to enforce . . . the terms of the plan." 29 U.S.C. § 1132(a)(3)(B); *see also Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 103-04 (2d Cir. 2005). However, as the statute makes clear, the relief sought must be equitable, rather than legal, in nature. *See Sereboff v. Mid Atlantic Med. Srvcs., Inc.*, 547 U.S. 356, 361-62 (2006); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 253 (1993). In order to satisfy this test, both the basis of the claim and the "nature of the underlying remedy" must be equitable. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002).

The Supreme Court has allowed fiduciaries of ERISA plans to bring suit under this provision to recover benefits paid as a result of injuries from an accident with a third party, where the beneficiary also recovers damages from that third party. *See Sereboff*, 547 U.S. at 369. Similarly, where the LTD plan includes an applicable offset provision, its fiduciaries may also recover payments to beneficiaries that are later offset by a retroactive award of Social Security benefits, *see, e.g.*, *Unum Life Ins. Co. of Am. v. Lynch*, No. 04 Civ. 9007 (CLB), 2006 WL 266562, at *3 (S.D.N.Y. Jan. 31, 2006), or awarded based on the misrepresentations of the beneficiary, *DiGiacomo v. Prudential Life Ins. Co.*, 501 F. Supp. 2d 626, 635 (D.N.J. 2007). In any such claim, however, the plan fiduciary "must seek not to impose personal liability on the [beneficiary], but to restore to the [LTD plan] particular funds or property in the [beneficiary's] possession." *Banyai v. Mazur*, No. 00 Civ. 980 (SHS),

2007 WL 959066, at *3 (S.D.N.Y. March 29, 2007) (quoting *Knudson*, 543 U.S. at 214).

### 2. Analysis

As an initial matter, Defendant fails to specify the provision of the LTD Plan that would allow it to recover the benefits payments it made to Kellner. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying the evidence that 'it believes demonstrate the absence of a genuine issue of material fact.'" *Celotex*, 477 U.S. at 317 (quoting Fed. R. Civ. P. 56); *see also Anderson*, 477 U.S. at 256; *Huminski*, 396 F.3d at 69. Although the authorization form signed by Kellner on March 23, 2001 put her on notice that misstatements or omissions in her benefits application might result in civil and criminal liability (FULCL at 456), Defendant does not indicate any provision of the LTD Plan that expressly allows a Plan fiduciary to recover wrongfully paid benefits.[9]

---

[9] Each of the cases Defendant brings to the Court's attention involved an ERISA plan fiduciary's attempt to enforce specific provisions of the plan. *See Sereboff*, 547 U.S. at 359 ("Acts of Third Parties" provision); *Disability Reinsurance Mgmt. Servs., Inc. v. DeBoer*, No. 06 Civ. 21 (LJ), 2006 WL 2850120, at *1 (E.D. Tenn. Sept. 29, 2006) (provision reducing LTD Plan benefits by "Other Income Benefits," such as social security payments); *Gutta v. Standard Select Trust Ins.*, No. 04 Civ. 5988 (BMM), 2006 WL 2644955, at *1 (N.D. Ill. Sept. 14, 2006) (same); *Gilcrest v. Unum Life Ins. Co. of Am.*, No. 05 Civ. 923 (GLF), 2006 WL 2251820, at *1 (S.D. Ohio Aug. 4, 2006) (same); *Lynch*, 2006 WL 266562, at *1 (LTD Plan required beneficiary to execute an agreement promising to repay "overpaid" benefits resulting from receipt of other deductible income). At oral argument, Defendant

More significantly, Defendant has failed to meet the exacting standard for summary judgment. First Unum's counterclaim states that "[i]f plaintiff was not entitled to all, or any part of, any disability benefit payments made to her, First Unum is entitled to recover same, together with interest from the date each such payment was made." (Answer at 2.) However, the Court's finding that First Unum did not abuse its discretion in terminating Kellner's benefits is *not* synonymous with a finding that Kellner wrongfully obtained benefits. Although Defendant's benefits determinations must be reviewed deferentially, First Unum is entitled to no such deference with respect to its counterclaim.

Put simply, the fact that Defendant's decision to terminate Plaintiff's long term disability benefits was reasonable and supported by "adequate" evidence — "adequate" being defined as "more than a scintilla but less than a preponderance," *Cellardo*, 318 F.3d at 146 — is not the same as demonstrating that Defendant is entitled to summary judgment on the counterclaim as a matter of law. The Court is not prepared to make such a finding on this record, and reserves such judgment for the ultimate trier of fact. Accordingly, First Unum's motion for summary judgment on its counterclaim is denied.

## C. Attorneys' Fees and Costs

First Unum also argues that it is entitled to attorneys' fees and costs. (Def.'s Mem. at 17.) Under ERISA, the Court has discretion

———————————————
admitted that "[t]his case is a little different . . . " from the cases cited. (4/16/08 Tr. at 17.)

to award "reasonable attorney's fees and costs." 29 U.S.C. § 1132(g)(1). The Second Circuit has articulated five factors to guide the exercise of that discretion: "(1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants." *Krizek v. Cigna Group Ins.*, 345 F.3d 91, 102 (2d Cir. 2003). Fees and costs are generally only available to a prevailing party in this Circuit, although the statute does not specifically impose that condition. *Proujanksy v. Blau*, No. 92 Civ. 8700 (CSH), 1999 WL 124457, at *4 (S.D.N.Y. Mar. 8, 1999).

Consideration of these factors in connection with Defendant's application for attorneys' fees and costs is premature because the counterclaim is still pending and additional fees may be incurred. Subsequent proceedings, if any, may also unearth additional information that aids the Court's analysis of whether Defendant is entitled to this relief. *See id.* at *5. Accordingly, Defendant's motion for fees and costs is dismissed without prejudice.

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is granted in part and denied in part. The motion is granted as to Kellner's claim for recovery of benefits. Accordingly, Kellner's claim is dismissed. The motion is denied with respect to Defendant's counterclaim and

denied without prejudice to renewal on the application for fees and costs. The Clerk of the Court is respectfully directed to terminate the motion docketed at document number 32.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: November 26, 2008
      New York, New York

* * *

Plaintiff Cynthia M. Kellner is represented by Michael Zolotoff Hack, Quadrino & Schwartz, P.C., 666 Old Country Road, Suit 207, Garden City, New York, 11530. Defendant First Unum Life Insurance Company is represented by Patrick Walter Begos, Begos and Horgan L.L.P. (CT), 327 Riverside Avenue, Westport, Connecticut, 06880.